UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HATTIE MAE TANNER,

        Petitioner,

                                      CASE NO. 04-CV-71155-DT
v.                                   HONORABLE VICTORIA A. ROBERTS

JOAN YUKINS,

              Respondent.
_____/

**OPINION AND ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

        Petitioner, an inmate at the Scott Correctional Facility in Plymouth, Michigan, has filed a

*pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging her first-

degree felony murder conviction which was imposed following a jury trial in the Calhoun

County Circuit Court in 2000.  Petitioner was sentenced to life imprisonment without the

possibility of parole on that conviction.  In her pleadings, Petitioner raises claims concerning the

admission of scientific evidence, the denial her motion for a DNA expert at trial, the denial of

her motion for a serological expert on appeal, pre-arrest delay, and the denial of her motion for

directed verdict/sufficiency of the evidence.  For the reasons stated below, the Court denies the

petition for writ of habeas corpus.

I.      **Facts**

        Petitioner's conviction stems from the armed robbery and stabbing death of a bartender in

Calhoun County, Michigan on March 22, 1995.  The Michigan Court of Appeals set forth the

relevant facts as follows:

    Defendant's convictions arise from the stabbing death of Sharon Watson, a

1

bartender at Barney's Bar and Grill (Barney's) located in Calhoun County, during the course of a robbery that occurred at the bar after 1:00 a.m. on March 22, 1995. Initially, the Battle Creek Police Department requested warrants for defendant, Dion Paav, and Robert Cady in July 1995 for their alleged involvement in the victim's robbery and murder, but the prosecutor declined to issue the warrants in the fall of 1995 on the ground that there was insufficient evidence to charge these individuals.  However, when a new prosecutor took office in 1997, an arrest warrant was eventually issued on May 23, 2000, for defendant only, charging her with open murder, M.C.L. § 750.316; felony murder, M.C.L. § 750.316; and armed robbery, M.C.L. § 750.529.

The case proceeded to trial in November 2000.  It was the prosecutor's theory that Cady, a close friend of defendant, used his status as a trusted regular customer of Barney's to gain entrance to the bar while the victim was in the process of closing the bar.  The prosecutor further theorized that defendant committed the murder with her own knife, leaving it at the bar next to a drop of her own blood. Alternatively, the prosecutor argued that defendant aided and abetted Cady in the felony murder by providing the murder weapon.

At trial, Cady was the prosecution's first witness. Cady testified that after getting out of work at 10:55 p.m. on March 21, 1995, he had planned to meet Paav at Nottke's Bowling Alley, Paav's place of work.  When Paav did not appear, Cady went to a bar, where he claimed that he attempted to call Paav at home.  Cady testified that he then called defendant to arrange for the purchase of crack cocaine.  Shortly after midnight on March 22, Cady drove to defendant's house and went with her to purchase crack cocaine.  After returning to defendant's house, Cady and defendant smoked crack cocaine together.  Cady testified that about one-half hour later, he left to cash a check and eventually went to Barney's at about 1:00 a.m.  Cady further testified that although the bar appeared to be closed when he arrived because the sign was off, he entered through an open side door and saw Watson, a friend whom Cady had known for about two years, and an unidentified white male customer in the bar.  Cady testified that because Watson had already closed out her cash register, she could not cash his check. Cady then left Barney's and went to another bar, the Green Tavern, where he cashed the check and drank a beer.  Cady testified that he called defendant at about 1:30 a.m. to say that he was returning to her house.  However, Cady first went to buy some more crack cocaine before stopping at defendant's house at approximately 2:30 a.m.  Shortly thereafter, Cady drove home, passing by Barney's at about 2:45 a.m.  According to Cady, while he found it unusual to see the bar's lights on at that hour, he nonetheless continued driving home without stopping.

Cady testified that at about 1:30 p.m. on March 22, 1995, Paav called and informed him that Watson had been found murdered in the basement of Barney's.

Although Cady was concerned about talking with the police because of his use of crack cocaine, he and Paav went to talk with the police later that afternoon. According to Cady, defendant had been to Barney's only once during the last five years. Cady further testified that he knew that Barney's would close before the usual 2:00 a.m. closing time if it were a slow night.

Cady admitted that he knew that after cashing out, the victim would take the money toward the back of the bar, where there was a storage area next to the bathrooms and basement stairs. Cady acknowledged that the victim also trusted Cady to watch the bar area while she cashed out. Cady also knew from talking to the victim and other bar employees that there was a safe in the basement.

On cross-examination, Cady testified that he was a friend of the victim and was trying to help the police find her killer when he became a suspect in the case. Cady also testified that he helped the police prepare two composite sketches of the man whom he claimed to have seen in the bar on the night of the homicide and robbery. Cady denied that defendant accompanied him to Barney's when he attempted to cash a check on the night in question. Cady also stated that, with the exception of being shown a picture of it, he had never seen the knife that the police recovered at Barney's.

On redirect examination, Cady testified that the victim had already cashed out by the time of his arrival at about 1:00 a.m. on March 22, 1995. Cady also admitted that, when interviewed by Officer Brad Wise of the Bedford Township Police Department on March 27, 1995, he stated that the victim would cash out early only if there were trusted regular customers in the bar. Cady further testified that during a conversation with the victim at Barney's at about his arrival at 1:00 a.m., he learned that the "stranger" who was sitting at the bar had been there since 12:15 a.m. Cady also admitted that he used a knife to cut up or chip rocks of crack cocaine on the night in question after previously denying it. Cady further admitted that if he ordered beer to go, it would have been a six-pack of "Bud light."

Watson's boyfriend, Jerry Dockum, testified that he received a call from the victim on the night in question and was told that she was closing early at about 1:30 a.m. At about 2:00 a.m., Dockum became concerned about her whereabouts and called the bar. When no one answered the phone, Dockum called his sister, Gloria Loring. According to Dockum, Watson never removed the cash drawer from the cash register in the presence of people whom she did not know. Dockum further testified that he had been present on one previous occasion when Watson, in Cady's presence, removed the cash drawer in the bar and took it downstairs. Dockum also testified that he had never seen defendant at the bar.

According to Maria Coller, a former employee of Barney's, she received a call from Loring after Dockum had called his sister. Maria Coller, who had keys to

3

the bar, and her husband, Ron Coller, then picked up Loring, and they went to Barney's, finding it unusual that the lights were on.  In addition, Watson's car was in the parking lot behind the bar, although the outside doors were locked.  According to Mr. Coller, they arrived at the bar at approximately 5:30 a.m. on March 22.  Upon entering through the side door of the bar, Mr. Coller almost tripped on a six-pack of Budweiser beer in a Michelob pack left on the floor with a napkin on top of it.  The television was blaring, and Watson's purse was on the back of the bar.  After calling the bar owners and 911, the Collers noticed a knife behind the bar where the glasses were washed.  On the back of a chair was the victim's coat.  The Collers also found a note for a take-out order of beer on the cash register behind the bar.  After Mr. Coller opened the door to the basement and observed loose cash at the bottom of the basement stairs, his wife called 911 a second time.  Going downstairs, the Collers walked all over the basement, looking for the victim.  When they discovered that the door to the basement office was closed, Mrs. Coller called 911 a third time at about 6:00 a.m.

Shortly thereafter, Tom Bliler, one of the bar's owners, arrived at the bar and helped Mr. Coller open the door to the office, where they found the victim's body.  According to Bliler, $1,009 had been stolen from the safe.  Bliler also testified that he had never seen the knife that was found behind the bar and that the knife did not belong to the bar.

Officer John Hancotte, who, at the time of the offenses, was employed by the Bedford Township Police Department, was the first police officer to arrive on the scene at 6:25 a.m. on March 22, 1995.  Upon finding that the victim had been dead for some time, Officer Hancotte called for additional help from the Battle Creek Police Department and the Michigan State Police. Reporting to the crime scene were Detective Michael VanStratton, the crime lab supervisor of the Battle Creek Police Department at the time of the murder, who was employed by the Kansas Bureau of Investigations at the time of trial, and State Trooper Harry O. Zimmerman, a crime-scene technician with the Michigan State Police, who was retired at the time of trial.

Detective VanStratton, who was qualified as an expert witness in the areas of bloodstain-pattern analysis, latent-fingerprint analysis, and crime-scene reconstruction, arrived at Barney's at approximately 7:00 a.m. on March 22, 1995, and determined that his personnel did not have the necessary equipment to process the crime scene.  After going back to the Battle Creek Police Department to retrieve additional equipment, Detective VanStratton returned to Barney's but found that "some of the areas which we thought might be critical for investigation had already been occupied by people that came in that morning," including bar employees, and that "[c]offee was being made behind the bar."  Detective VanStratton testified that because "there was some important evidence behind the bar," it was the first area that was isolated.

4

According to Detective VanStratton, the crime-scene technicians began collecting evidence upstairs in the bar, finding a bloodstained napkin stuck inside a six-pack of beer, a knife and diluted bloodstains on the stainless steel sink area directly behind the bar, the victim's purse, two drinking glasses, a cash register receipt, and "a small piece of paper that had to go with five dollars beer to go, a price of $5.10," which "were in the immediate area behind the bar."  Detective VanStratton testified that the crime-scene technicians proceeded downstairs to the basement office where the victim's body was found.  Scattered on the floor in front of the basement office door were seven $5 bills, which were collected as evidence.  The crime technicians also collected a bloodstain that was found on the plasterboard wall at the bottom of the stairs, along with a piece of the wall containing what appeared to be knife punctures.

Detective VanStratton testified that when he entered the basement office, the victim was found on her back, with bloodstains smeared across her abdomen and "some stab wounds to the chest area."  In Detective VanStratton's opinion, it was apparent that a struggle had taken place given the disarray in the office and the scrapes that were found on the victim's arms.  Detective VanStratton further testified that there was an excessive amount of blood on the victim's body, "particularly her neck area and chest area."  In Detective VanStratton's opinion, the victim's assailant would also have had blood on his or her hands and possibly on his or her clothing because the victim's bloodstains were transferred to the assailant.  According to Detective VanStratton, "we did find some blood transfer on the napkin that was found upstairs."  Detective VanStratton also testified that three identifiable prints were found on the cash box, one belonging to the victim and the other two to the bar's owner, but that the police were not able to develop fingerprints from the other crime-scene evidence.

On cross-examination, Detective VanStratton testified that he first arrived at the bar shortly after 7:00 a.m. on March 22, 1995, and returned to it after 8:00 a.m. When he returned to the bar, there were a number of people inside, including the victim's friends and bar employees.  In his testimony, Detective VanStratton agreed with Officer Hancotte's estimate that there were about seven people in the bar at that time who were not law-enforcement people.  According to Detective VanStratton, people were mingling in the area where the knife, the bloodstains on the sink, and the bloodstained napkin on the six-pack of beer were found. Although people were drinking coffee in this area of the bar, Detective VanStratton did not see anybody eating.  Detective VanStratton also testified that because the bloodstains on the sink were diluted, "[t]here's no way to tell if it was fresh or not fresh," in determining how long the bloodstains had been present. Detective VanStratton further testified that blood had been transferred from the victim to the assailant during the physical struggle in the basement office, but he refused to speculate whether there was more than one assailant.

According to Dr. Stephan Cohle, who was qualified as a forensic pathologist, the

victim suffered both "blunt force injury" and "sharp force injury."  The
blunt-force injuries consisted of scrapes and bruises, while the sharp-force
injuries were "primarily stab wounds."  Dr. Cohle testified that the victim suffered
"a total of six stab wounds, four in the chest, two in the back."  Dr. Cohle opined
that "[t]he cause of death was [a] stab wound in the chest," which extended into
the heart, causing massive bleeding.

George Bliler, the son of one of Barney's owners, also testified for the
prosecution.  According to George Bliler, Cady arrived at the bar between 8:00
and 9:30 a.m. on March 22, 1995, curious about why all the police were present,
but departed after only a few minutes.

Officer Brad Wise, who was employed by the Bedford Township Police
Department at the time of the offenses, testified that Cady approached him in the
afternoon of March 22 and gave him a description of the white male customer in
his thirties whom Cady claimed to have seen the night before when he entered the
bar.  Officer Wise subsequently interviewed defendant twice about the case, the
first time by telephone and the second in person.  During the second interview on
May 3, 1995, defendant told Officer Wise that Cady came to her house at 11:00
p.m. on March 21, 1995, to drink alcohol and smoke crack cocaine.  According to
Officer Wise, defendant told him that Cady then left to cash a check and returned
with $50, which they used to purchase more crack cocaine.  According to Officer
Wise, defendant told him that she and Cady left her mother's home at about 3:00
a.m. after her mother complained that they were making too much noise.
Defendant also told Officer Wise that she had not been to Barney's for five or six
years.

On cross-examination, Officer Wise acknowledged that Cady assisted the police
in preparing a composite sketch of the man whom he claimed was in the bar on
the night in question.  Officer Wise also acknowledged that after the homicide
and robbery, he talked with Dennis Fodor, who originally corroborated Cady's
description of the other man in the bar.  Officer Wise admitted that after talking to
Fodor, he reported that Fodor gave a description of the other man in the bar as
looking like Cady.  However, Officer Wise disputed whether Fodor's statement
corroborated Cady's description of the other man.  Officer Wise testified that
although Fodor originally stated that he was in the bar until closing time, "the
second time I talked to Mr. Fodor he indicated that he was there 'till last call,
which was eleven o'clock."  Officer Wise, however, explained that "[Fodor] said
that it was his last call" because he had had too much to drink by that point, and
"the bartender cut him off."

Thereafter, in the middle of May 1995, Detective David Walters of the Battle
Creek Police Department was assigned to the case and, after reviewing the case
file and talking with Officer Wise, decided to focus his investigation on Robert
Cady, his wife Jennifer Cady, Dion Paav, and defendant.  On May 24, 1995,

Detective Walters interrogated defendant at the Battle Creek Police Department
and showed her a photograph of the knife that was recovered at crime scene.
According to Detective Walters, defendant recognized that it was her knife
because she had altered "the blade end of the knife" to make it easier "to clean up
her crack pipes." However, during the interview, defendant gave no indication
that she had been at Barney's during the early morning hours of March 22, 1995.

Detective Walters then interviewed Paav and Jennifer Cady on May 25, 1995, but
neither one provided much direction to his investigation. However, after
interviewing Robert Cady on May 26, 1995, Detective Walters began to
concentrate his attention on Cady as the principal suspect in this case, meeting
him in the parking lot of Barney's for a second interview on June 2, 1995.
According to Detective Walters, when they approached one another in the parking
lot, Cady was wearing sunglasses, even though it was "a dark, dreary day," and
"he was visibly shaking, like his body was shaking, his hands were shaking."
While inside the bar, Cady acknowledged in response to Detective Walters'
questioning that he knew that the safe was kept in the basement of the bar,
although he did not know where the entrance to the basement was in the bar.

Subsequently, on June 7, 1995, Detective Walters, accompanied by Detective
David Adams of the Battle Creek Police Department, questioned defendant once
again about the homicide that occurred at Barney's on March 22, 1995. During
the interview, which took place in a police car, Detective Walters showed
defendant a photograph of the knife that was found in the bar. According to
Detective Walters, defendant acknowledged that it was her knife, indicating that
she had used it at her mother's residence where she lived. Detective Walters
further testified that defendant indicated that her fingerprints or those of Paav,
who lived at the same residence, would be on the knife because "they had both
handled the knife" about "three to four weeks prior to the homicide."

Detective Walters also testified that, during the June 7, 1995, interview, defendant
admitted that she accompanied Cady to Barney's after 1:00 a.m. on March 22,
1995. According to Detective Walters, defendant stated that she stayed in the
vehicle, while Cady went inside the bar to cash a check, and that there were a
couple of cars in the parking lot at the time. Detective Walters testified that
defendant stated that after leaving Barney's at approximately 1:30 a.m., she and
Cady then went to various other establishments that night to cash a check and buy
beer before stopping to purchase some crack cocaine. When Detective Walters
questioned defendant about whether she might have been responsible for killing
the victim, she shook her head in denial. When questioned about the
circumstances under which she might commit such a homicide, Detective Walters
reported that defendant said that "if that bitch had treated her bad she would do
something to that effect." Detective Walters further testified that "Defendant said
that the person that would have been responsible for this would have been [sic]
blood on them and that Rob-- meaning Rob Cady--didn't have any blood on him.

7

And she said what would she have done with the bloody clothes. I think she also said to the effect the person would have had--the victim was moved to the basement so the person would have had to have blood on them that did that."

On cross-examination, Detective Walters, who, at the time of trial, was retired from the Battle Creek Police Department after twenty years of service, acknowledged that, at some point during his two-month investigation into the homicide and robbery, the police conducted a search of defendant's residence with her consent and seized her clothes, including her purple jogging suit and nightgown, for any "trace evidence," such as blood and hair fibers, to determine whether they matched the blood and hair fibers that had been found at the crime scene. Detective Walters indicated that the hair and fiber comparison did not reveal any match. The police also searched Cady's residence with his consent, seizing some articles of his clothing. Cady's car was also searched on May 26, 1995, but the police found no blood or hair evidence linking him to the crime. Although Paav's residence was not searched, the police searched his vehicle, but again found nothing linking Paav to the crime.

In response to defense counsel's questioning about the interrogation conducted on May 24, 1995, at the Battle Creek Police Department, Detective Walters admitted that he experienced "some problems with the audio-visual equipment" that was used to record the interview. Specifically, during the interview, Detective Walters discovered that "[t]he equipment was not working properly," and that at some point the audio started to work properly again, but not the video, which apparently never worked throughout the interrogation. As a result, only about one-half of the lengthy interrogation was audiotaped. A thirty-two-page transcript of the audiotaped portion of the interrogation was thereafter prepared. However, Detective Walters admitted that he had never listened to the audiotape in order to compare it with the transcript that was prepared of the May 24, 1995, interrogation. Detective Walters further admitted that defendant's articulation was "rough at times" and that she was difficult to understand. As a result, there were 261 "inaudibles" in the thirty-two-page transcript, which Detective Walters admitted was a surprisingly high number for a transcript of this length.

Although Detective Walters testified on direct examination that defendant stated in the interrogation at the police station on May 24, 1995, "[t]hat the knife was hers" and that "she recognized the knife by the point on it," he conceded on cross-examination that while she stated that "it looks like one of my knives," her answer to the question whether it was "one of your knives" was transcribed as her "saying no." In addition, defendant's other answers to his questions about the knife were inaudible. Notwithstanding, Detective Walters stood by his testimony given in direct examination that defendant admitted that the knife was hers. Detective Walters acknowledged that despite the high number of inaudibles in the transcript of the May 24, 1995, interrogation, he did not send the tape to the Michigan State Police Crime Laboratory to enhance the sound quality.

Detective Walters also acknowledged that at 1:10 a.m. on March 22, 1995, "officially, there was a report of a pickup truck style vehicle being seen leaving the area."  According to Detective Walters, the pickup truck was "possibly a light colored pickup" with "[a] homemade box with a box or wooden frame in the back."  Detective Walters testified that the police investigated this information, but did not find a pickup truck that matched the description of the vehicle.

On cross-examination, Detective Walters conceded that the police had no direct evidence that defendant was in the basement of Barney's at the time of the murder. Detective Walters also acknowledged that while Cady and Paav were suspects, they were not charged in this case.  Further, while Detective Walters admitted that defendant never told him that the knife found in the bar belonged to Paav, he conceded that he told Paav during an interview on June 7, 1995, that defendant said that the knife was his.  Detective Walters admitted that he lied to Paav because he wanted "to see if [he] was telling [ ] the truth."  Detective Walters also admitted that he lied to defendant when he told her during an interview that her fingerprints were on the knife.  Detective Walters further admitted that defendant denied going with Cady to cash a check at Barney's on the night in question and also denied being in the bar that night.

Dion Paav testified that he knew the victim as a bartender at Barney's and found out about her death on the morning of March 22, 1995, when a cook at Barney's called to tell him that she had been murdered.  Paav, then forty-five years old, testified that he had been friends with Cady since he was ten years old.  Paav testified that he planned on meeting Cady at Barney's on the evening of March 21, 1995, because both of them lived near Barney's, where they were regular customers.  However, after getting off work at 4:00 p.m., Paav went straight home and did not go to Barney's.  Paav testified that he did not receive a call from Cady or anyone else that night.  Paav also testified that he could not recall telling Detective Walters about a telephone conversation that he had with defendant while house-sitting for Cady after the murder.  However, when presented with a previous statement he made to the police, Paav admitted that he did have a conversation with defendant at some point, although he claimed that he could barely understand her and that she said something about fingerprints and the knife.

On the final day of the trial, Detective Walters was recalled by the prosecution and testified that Paav told him that when he was house-sitting for Cady over the Memorial Day weekend in 1995, he received a telephone call from defendant.  According to Walters, "[Paav] said that she thought the police had found her fingerprints on the knife at Barney's and also that the police had gotten her--taken her tennis shoes."

The prosecution also called Megan Clement, an employee of Laboratory Corporation of American (LabCorp), a DNA-testing company based in North

Carolina, who was qualified as an expert witness in DNA and serological analyses. Clement testified that she was unable to obtain DNA results from the blood found on the sink behind the bar because there was an insufficient amount of DNA from which to develop a profile for the purpose of comparing it with defendant's blood sample. According to Clement, she tested six bloodstains from the victim's shirt and that "the profile on all six strains were consistent with one other, and all six stains were consistent with originating from the same individual; however, it could not have been Ms. Tanner. Her profile was different than the profile on these six stains." However, Clement did not identify whose profile was contained on the six bloodstains.

Clement also testified about the process of serological testing, explaining that there are four common blood types--A, B, AB, and O--and that there were ten different types of the enzyme phosphoglucomutase (PGM) found in human blood, thus permitting subtyping with regard to blood type and PGM. According to Clement, "if you type for ABO and PGM, you look at the frequency of ABO times the frequency [of] the PGM to come up with what percentage of the population would have both of the characteristics in the sample detected." Clement then explained:

> In the Caucasian population a type B blood is approximately ten percent and a PGM two plus one plus is approximately 20 percent, actually 21 percent. If you multiply the two for a person to have type B blood and be a two plus one plus it would be approximately two percent of the population of the Caucasian population.

Clement added:

> In the African-American population a type B is much higher. It's approximately 20 percent. And the PGM two plus one plus is about 19.8 percent, so approximately 20 percent as well. So a person who have [sic] blood type B and PGM two plus one plus in the African-American population would be approximately four percent so it would be twice as common in the African-American population as the Caucasian.

On cross-examination, Clement acknowledged that there was insufficient blood to obtain DNA results from the bloodstain that was found near the sink in the bar. In addition, Clement testified that the DNA analysis of the six bloodstains exculpated defendant. During cross-examination, defense counsel also questioned Clement about how many people in the United States have type B and PGM two plus one plus. In response, Clement stated that considering that African-Americans constituted twenty-six percent of the United States population of 280 million people, "26% of 280 million people times four percent of that" resulted in "[p]ossibly millions" matching this serological profile. Defendant is African-American.

10

Nibedita Mahanti, who was employed by the Michigan State Police, also testified as an expert witness in DNA analysis for the prosecution.  Mahanti testified that she performed DNA analysis on blood samples from the victim, defendant, Cady, and Paav and from the evidence items that were submitted to her.  In Mahanti's opinion, the DNA profile of the blood samples from the knife, the napkin, and a stained cloth matched the DNA profile of the victim.  The DNA profile of the victim was also found on one napkin from the bar, a blood sample that was taken from next to the knife, and a section of cardboard from a box.  The blood sample from the bar sink, however, had insufficient DNA to produce a reliable result.  In addition, blood found on the section of the victim's shirt contained the DNA profile of an unknown donor, because it was not contributed by the victim, defendant, Cady, or Paav. Defense counsel stipulated the admission of Mahanti's DNA report and moved, without objection, that Mahanti be recognized as an expert in DNA analysis.

The prosecution also called Marie Bard-Curtis to testify as an expert in the area of serology. Bard-Curtis, who was employed by the Michigan Department of State Police Forensic Science Division Microchem Subunit, testified that she performed serological testing on the following evidence items received from the Battle Creek Police Department:  "a white folded paper packet identified as containing a sample from the bar sink"; "a control sample from that area"; "a sample from the bar top near the beer taps; a "[s]ample from a napkin in a beer six pack"; "[a] sample from the bar and the sink next to the knife"; "[a] sample portion of wallboard with a blood stain"; "a portion of a box lid"; and blood samples of the victim whose first name was incorrectly recorded as Susan.  Bard-Curtis also obtained ABO blood typing for the victim, defendant, Cady, and Paav, as well as PGM typing of the blood of the victim and defendant.

Bard-Curtis testified that the victim had blood type B and PGM subtype of 2+, 1-, while defendant had the blood type B and PGM subtype of 2+, 1+. Cady and Paav both had blood type A.  The samples from the bar top, the bar and sink next to the knife, the wallboard and cardboard box were tested and showed the presence of human blood, but insufficient protein was available to perform PGM subtyping. Testing performed on the articles of clothing seized from defendant's residence did not disclose the presence of human blood.  However, with regard to the sample of blood taken from the bar sink that was found next to the knife, Bard-Curtis testified:  "The ABO type determined on the blood on the bar sink was type B. Hattie Mae Tanner was blood type B.  The PGM subtyping detected on the sample from the bar sink was two plus one plus and Hattie Mae Tanner was also two plus one plus."

On cross-examination, Bard-Curtis testified that no results were obtained from the control sample, indicating that contamination had not affected the results. However, Bard-Curtis admitted that she did not know if "whole blood samples" were submitted to her for analysis, and that it was possible that the bloodstains

could have been the mixture of more than one person's blood.  On redirect examination, Bard-Curtis clarified her testimony.  Assuming that two individuals contributed to a blood sample, Bard-Curtis testified that both individuals would have to have type B blood if the result were a type B sample and both would also have the same PGM enzyme subtyping.

After the prosecution rested, defendant's first witness was Catherine Huskins, who testified that she knew the victim and that she and her husband informed the police that before the murder the victim had found a nonfolding knife and that the victim had told her husband that she was going to keep it in her purse.  However, on cross-examination, Huskins, after being shown the knife, admitted that she had never seen the knife before.

Defendant next called Dale Crum, who worked at Barney's in 1995 and at the time of the trial.  According to Crum, the door to the basement at Barney's was kept shut but unlocked during business hours so that employees could access the basement for food and supplies.

Defendant also called her mother, Hattie Mae Tanner, to testify in her behalf. Mrs. Tanner testified that on the evening of March 21, 1995, defendant was home and that Cady, who was a frequent visitor to her house, was also present. According to Mrs. Tanner, Cady was sitting at her dining-room table drinking beer when she woke up in the morning.  Mrs. Tanner did not see any blood on defendant's clothing.

Todd Green, whose family owns Green's Tavern, testified as a defense witness that Cady was at the bar for about fifteen minutes after midnight on March 22, 1995.  Green testified that Cady, after cashing a check at the bar, drank a beer and made a telephone call before leaving.

Defendant testified in her own behalf that Cady was at her mother's house on March 22, 1995, and that they smoked crack cocaine together before Cady left to cash a check.  According to defendant, Cady returned to her mother's house after cashing a check, but left again around 2:30 a.m. or 3:00 a.m.  Defendant denied that she went anywhere with Cady that night except to purchase crack cocaine with him shortly after midnight.  Specifically, defendant denied that she went with Cady to Barney's on the night in question, that she killed the victim, that the knife in question was hers, and that she told Detective Walters that the knife was hers. Defendant testified that she could not remember having ever gone to Barney's, although she acknowledged that Cady told her that she had been there once about ten years previously.  According to defendant, any indication in the tape recording that she told Detective Walters that she had been to Barney's a couple of times was incorrect.  As for the knife, defendant testified that when she was questioned by Detective Walters at the police station, "I told him yes, [it] looked like a knife I used to have.  I asked him did it bend or fold.  He said no.  I

said it couldn't have been my knife because it's not allowed on the job, straight
bladed knife." Defendant also denied giving any statement to Detective Walters in
his police car on June 7, 1995.

Defendant also called Kevin Sage, who testified that while passing by Barney's
between 1:15 and 1:25 a.m. on March 22, 1995, he saw "a light colored truck with
a pickup--or a wooden cap on it" that "looked like ... a house." According to
Sage, he saw "a driver that looked white, Caucasian with a beard and there was a
passenger."

Defendant's final witness was Nancy Chantrene, who testified that at 2:47 a.m. on
March 22, 1995, she passed Barney's en route to work at the post office when she
noticed that the outside sign was on, which was unusual. According to
Chantrene, a light colored truck "that had a cap on it" was parked along the west
end of the bar.

*People v. Tanner*, 255 Mich. App. 369, 372-93, 660 N.W.2d 746 (2003).

At the close of trial, the jury found Petitioner guilty of first-degree felony murder,

second-degree murder, and armed robbery. The trial court ultimately vacated the second-degree

murder and armed robbery convictions and sentenced Petitioner to life imprisonment without

parole on the felony murder conviction.

## II.   **Procedural History**

Following sentencing, Petitioner filed an appeal as of right with the Michigan Court of

Appeals essentially raising the same claims presented in the instant petition. The Michigan

Court of Appeals reversed her conviction and remanded the case for a new trial, concluding that

the trial court's denial of her motion for a DNA and serological expert denied her a fair trial and

that the trial court erred in denying her motion for directed verdict as to the prosecution's theory

that she aided and abetted felony murder. *People v. Tanner*, 255 Mich. App. 369, 660 N.W.2d

746 (2003). The Michigan Supreme Court, however, reversed the Michigan Court of Appeals'

decision and remanded the case to the trial court for reinstatement of Petitioner's felony murder

conviction and sentence. *People v. Tanner*, 469 Mich. 437, 671 N.W.2d 728 (2003).

Petitioner thereafter filed the present habeas petition asserting the following claims:

I.      She was denied due process when evidence of serological testing was admitted without a determination that such evidence met the *Davis-Frye* standard for admissibility: that it has been accepted by the scientific community.

II.     She was denied due process when the court denied trial counsel's motion for a DNA expert.

III.    She was denied due process when the court denied appellate counsel's motion for funds to retain a serological expert.

IV.     She was denied due process because of the unconscionable delay in arresting her.

V.      She was denied due process when the court denied her motion for a directed verdict.  Her conviction for murder violates her state and federal rights to be free from conviction in the absence of proof of guilt beyond a reasonable doubt.

Respondent has filed an answer to the petition asserting that the claims should be denied based upon procedural default and/or for lack of merit.

## III.   <u>Standard of Review</u>

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., govern this case because Petitioner filed this habeas petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination

14

of the facts in light of the evidence presented in the State court
proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule
that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of
facts that are materially indistinguishable from a decision of [the Supreme] Court and
nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S.
12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see
also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of §
2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the
correct governing legal principle from [the Supreme] Court but unreasonably applies that
principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)
(quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. "In order for a federal court
find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's
decision must have been more than incorrect or erroneous. The state court's application must
have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see
also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether
the state court's decision comports with clearly established federal law as determined by the
Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412;
*see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require
citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme
Court] cases, so long as neither the reasoning nor the result of the state-court decision

15

contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

While the requirements of "clearly established law" are to be determined solely by the Supreme

Court's holdings, the decisions of lower federal courts are useful in assessing the

reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d

667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow,

J.).

Lastly, this Court must presume that state court factual determinations are correct. *See*

28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and

convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**IV.**    **Analysis**

A.    Evidentiary Claim

Petitioner first claims that she is entitled to habeas relief because the trial court admitted

evidence of serological testing without determining that such evidence met the *Davis-Frye*

standard for admissibility of being accepted by the scientific community. Respondent contends

that this claim is barred by procedural default and lacks merit.

Habeas relief may be precluded on claims that a petitioner has not presented to the state

courts in accordance with the state's procedural rules. In *Wainwright v. Sykes*, 433 U.S. 72, 85

(1977), the United States Supreme Court explained that a petitioner's procedural default in the

state courts will preclude federal habeas review if the last state court rendering a judgment in

the case rested its judgment on the procedural default. In such a case, a federal court must

determine not only whether a petitioner has failed to comply with state procedures, but also

whether the state court relied on the procedural default or, alternatively, chose to waive the

procedural bar. "A procedural default does not bar consideration of a federal claim on either

16

direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last *explained* state court judgment should be used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

Here, the Michigan Court of Appeals rendered the last reasoned opinion on this issue. In denying relief on this claim, the court relied upon a state procedural bar -- Petitioner's failure to object to the admission of the evidence on the same basis at trial. *See Tanner*, 255 Mich. App. at 394. The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. *See People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999); *see also Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. *See Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Plain error review does not constitute a waiver of state procedural default rules. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. *See McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). In this case, the Michigan Court of Appeals denied this claim based upon Petitioner's failure to make the same objection at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of

justice. *Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

In this case, Petitioner neither alleges nor establishes cause to excuse her default. A federal habeas court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Nonetheless, the Court notes that Petitioner cannot establish prejudice as this claim lacks merit.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Clemmons v. Sowders*, 34 F.3d 352, 356 (6th Cir. 1994). Such is not the case here. As noted by the Michigan Court of Appeals, the Michigan courts have accepted the reliability of serological electrophoresis to identify blood types and PGM markers such that the admission of the challenged evidence was proper and did not render Petitioner's trial fundamentally unfair. *See Tanner*, 255 Mich. App. at 395-96.

Lastly, Petitioner has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 326-27 (1995). "'[A]ctual innocence" means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). To be credible, a claim of actual innocence requires a petitioner to support her allegations of constitutional error with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness

18

accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. Her evidentiary claim is thus barred by procedural default, otherwise lacks merit, and does not warrant habeas relief.

       B.      <u>DNA and Serological Experts Claim</u>

Petitioner next asserts that she is entitled to habeas relief because the trial court failed to provide her with a DNA expert at the time of trial. She relatedly asserts that she is entitled to habeas relief because the state courts failed to provide her with a serological expert on direct appeal. Respondent contends that these claims lack merit.

Petitioner has identified no clearly established federal law as determined by the United States Supreme Court which entitles her to independent experts as necessary to obtain habeas relief under 28 U.S.C. § 2254(d)(1). The only case arguably on point is *Ake v. Oklahoma*, 470 U.S. 77 (1985). The Supreme Court's holding in *Ake*, however, was limited:

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83. The Supreme Court did not discuss a defendant's entitlement to other court-appointed experts outside the context of an insanity defense. Subsequent to *Ake*, the Supreme Court has explicitly declined to answer this question. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985).

In light of the language of *Ake* and the Court's reservation in *Caldwell*, there is disagreement over whether *Ake* requires the provision of expert services beyond psychiatric services necessary to present an insanity defense. *Cf. Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (petitioner denied opportunity to present an effective defense by failure to appoint

independent pathologist), *with McKenzie v. Jones*, 100 Fed. Appx. 362, 364-65 (6th Cir. 2004)

(petitioner did not have a constitutional right to the appointment of an expert of his personal

liking or to receive funds to hire his own) *and Baxter v. Thomas*, 45 F.3d 1501, 1511 n.24 (11th

Cir. 1995) (declining to extend *Ake* to non-psychiatric experts).

   Under the AEDPA, however, the question is not whether this Court, or the United States

Court of Appeals for the Sixth Circuit, would extend *Ake* to require the provision of non-

psychiatric experts.  Rather, the question is whether *Ake* clearly establishes Petitioner's right to

the appointment of such experts.  In pre-AEDPA cases, courts have held that extending *Ake* to

non-psychiatric experts would amount to a "new rule" of constitutional law which could not be

applied on collateral review under the Supreme Court's decision in *Teague v. Lane*, 489 U.S.

288 (1989).  *See Gray v. Thompson*, 58 F.3d 59, 66 (4th Cir. 1995), *vacated on other grounds*,

518 U.S. 152 (1996);  *Jackson v. Ylst*, 921 F.2d 882, 885-86 (9th Cir. 1990).  The *Teague* rule is

"the functional equivalent" of the clearly established law requirement of § 2254(d)(1), *see*

*Williams*, 529 U.S. at 379 (opinion of Stevens, J.), and thus a rule which fails to satisfy *Teague*

also fails to satisfy § 2254(d)(1).  *Id.* at 380 (opinion of Stevens, J.); *id.* at 412 (opinion of

O'Connor, J., for the Court); *see generally Williams v. Cain*, 229 F.3d 468, 474-75 (5th Cir.

2000) (discussing relationship between *Teague* and § 2254(d)(1)).  Thus, Petitioner's asserted

right to the appointment of DNA or serological experts (*i.e*, non-psychiatric experts) was not

clearly established law under § 2254(d)(1) at the time of her conviction.  *See Weeks v.*

*Angelone*, 4 F. Supp. 2d 497, 521-22 (E.D. Va. 1998), *aff'd*, 176 F.3d 249, 264-65 (4th Cir.

1999), *aff'd on other grounds*, 528 U.S. 225 (2000).  Accordingly, Petitioner is not entitled to

federal habeas relief on this claim.

   Furthermore, even if *Ake* could be viewed as establishing a right to DNA or serological

expert witnesses in cases such as this one, Petitioner has not established that the trial court's refusal to appoint a DNA or serological expert deprived her of a substantial defense or otherwise rendered her criminal proceedings fundamentally unfair.  As discussed by the Michigan Supreme Court, the DNA evidence presented by the prosecution excluded Petitioner as the source of blood found in the bar and on the victim's shirt.  Thus, Petitioner cannot establish that she was prejudiced by any failure to appoint an expert with respect to this exculpatory evidence.  As to the serological evidence, the bloodstain by the sink implicated Petitioner in the crime, albeit as one of a millions of persons who shared her bloodtype and PGM subtype.  Petitioner, however, has not shown how the appointment of a serological expert would have likely benefitted the defense.  She has not challenged the testing methods or the testifying expert's conclusions.  In the state courts and in this Court, Petitioner has only speculated that the appointment of an expert witness would have provided some unidentified assistance to her case.  Such conclusory allegations are insufficient to justify federal habeas relief.  *See, e.g., Workman v. Bell*, 160 F.3d 276, 287 (6th Cir. 1998).  Petitioner has thus failed to establish that the Michigan Supreme Court's decision is contrary to United States Supreme Court precedent or that it constitutes an unreasonable application of the law or the facts. Habeas relief is not warranted on this claim.

  C. <u>Pre-Arrest Delay Claim</u>

   Petitioner next asserts that she is entitled to habeas relief based upon pre-arrest delay. Respondent contends that this claim lacks merit.  The Due Process Clause prohibits unjustified pre-indictment or pre-arrest delay.  *See United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Marion*, 404 U.S. 307, 324-26 (1971).  To prevail on such a claim, a defendant must show substantial prejudice to her right to a fair trial and intent by the prosecution to gain a

tactical advantage.  *Marion*, 404 U.S. at 324.

The Michigan Court of Appeals rejected this claim, finding that Petitioner had alleged "only vague claims of faded memories and lost witnesses without specifically showing how these alleged deficiencies actually and substantially impaired her defense." *Tanner*, 255 Mich. App. at 415.  The court also found that the trial court did not clearly err in finding that the delay resulted from further police investigation and the prosecution's need to have sufficient evidence to proceed.  *Id.*  This Court agrees and finds that the Michigan Court of Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  Petitioner has failed to show that she was substantially prejudiced by any pre-arrest delay.  Conclusory allegations, without evidentiary support, do not provide a basis for habeas relief.  *See Workman*, 160 F.3d at 287.  Petitioner has also offered no evidence to show that the delay was intended to secure a tactical advantage by the prosecution.  To the contrary, the evidence indicated that the delay was caused by the need for further investigation into the case. She is thus not entitled to habeas relief on this claim.

D.    Directed Verdict/Sufficiency of the Evidence Claim

Lastly, Petitioner asserts that she is entitled to habeas relief because the trial court erred in denying her motion for directed verdict where the evidence was insufficient to support her conviction.  Respondent contends that this claim lacks merit.

To the extent that Petitioner relies upon state law to assert that she was entitled to a directed verdict on the felony murder charge, she fails to state a claim for habeas relief.  It is well-settled that habeas relief may not be granted for alleged violations of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Shacks v. Tessmer*, 2001 WL 523533, *6 (6th Cir. May 8, 2001) (unpublished) (finding no merit in petitioner's claim that the trial court erred

22

in denying his motion for directed verdict of acquittal on first-degree murder charge based upon alleged state law violations).

Petitioner, however, also contends that the prosecution presented insufficient evidence to support her felony murder conviction.  In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the United States Supreme Court established that a federal court's review of a sufficiency of the evidence claim must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319; *see also DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998).  The Court must view this standard through the framework of 28 U.S.C. § 2254(d).  *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002).  The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16.  "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (citation omitted).

Under Michigan law, a person who commits murder during the perpetration of a felony is guilty of first-degree murder.  *See* Mich. Comp. L. § 750.316.  The elements of felony murder are:  (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in the statute.  *People v. Carines*, 460 Mich. 750, 759, 597 N.W.2d 130 (1999).  The facts and circumstances of the killing may give rise to an inference of malice, including evidence that the defendant used a deadly weapon.  *Id.*  The elements of armed robbery are: (1) an assault, (2) a felonious taking of

23

property from the victim's person or presence, and (3) while armed with a weapon described in the statute. *People v. Johnson*, 215 Mich. App. 658, 671, 547 N.W.2d 65 (1996). To convict a defendant under an aiding and abetting theory, the prosecution must establish that the crime was committed by the defendant or some other person, that the defendant performed acts or gave encouragement that aided or assisted in the commission of the crime, and that the defendant either intended to commit the crime or knew that the principal intended to commit the crime at the time he or she gave the aid or encouragement. *Carines*, 460 Mich. at 757-58.

In this case, the Michigan Court of Appeals concluded that the prosecution presented sufficient evidence to establish Petitioner's guilt of felony murder as a principal. *See Tanner*, 255 Mich. App. at 418-19. The Michigan Supreme Court agreed with this determination and further concluded that the prosecution presented sufficient evidence to establish Petitioner's guilt of felony murder under the alternate theory that she was an aider and abetter to the crime. *See Tanner*, 469 Mich. at 444 n. 6.

Having reviewed the record, this Court concludes that the state courts' respective decisions are neither contrary to *Jackson, supra*, nor an unreasonable application of federal law or the facts. Detective Walters' testimony regarding Petitioner's statements, the bloodstain which matched Petitioner's bloodtype and PGM subtype found on the bar sink next to the knife, and the testimony that the knife may have belonged to Petitioner implicated Petitioner in the crime. Testimony also placed Petitioner and Mr. Cady together at or outside the bar on the night of the murder. Additionally, the wounds inflicted upon the victim and the state of the crime scene supported a finding that a robbery occurred and that the perpetrator acted with sufficient intent to support a first-degree murder conviction. While the evidence was not overwhelming, it was sufficient to support Petitioner's conviction when viewed in a light

24

favorable to the prosecution.  This Court cannot conclude that the state courts' decisions in this regard are contrary to Supreme Court precedent or an unreasonable application of the law or the facts.   Petitioner's insufficient evidence claim essentially challenges the inferences that the jury drew from the testimony presented at trial and challenges the weight to be accorded certain pieces of evidence.  However, it is well-settled that "[a] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983).  Given the evidence at trial, a rational trier of fact could find that Petitioner participated in the crime and acted with sufficient intent to kill so as to support her felony murder conviction beyond a reasonable doubt.  Habeas relief is not warranted on this claim.

**V.**      **Conclusion**

       For the reasons stated, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in her petition.

       Accordingly;

       **IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH PREJUDICE**.


                                            S/Victoria A. Roberts_____
                                            Victoria A. Roberts
                                            United States District Judge


Dated:  November 7, 2005

The undersigned certifies that a copy of this document was served on the attorneys of record and petitioner by electronic means or U.S. Mail on November 7, 2005.

s/Carol A. Pinegar
Deputy Clerk